# In the United States Court of Federal Claims

No. 09-301C
Filed: February 15, 2010
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | \*   Anti-Assignment Acts, 31 U.S.C. § 3737, |
| | \*     41 U.S.C. § 15; |
| | \*   Anticipatory Repudiation; |
| | \*   Cardinal Change of Contract; |
| | \*   Cure Notice; |
| MARYLAND ENTERPRISE, L.L.C., | \*   Declaratory Judgment; |
| | \*   Federal Acquisition Regulations, 48 C.F.R. § |
| Plaintiff, | \*     552.270-13 (Itemized Cost Proposal); |
| | \*     48 C.F.R. § 552.270-14 (Changes Clause); |
| v. | \*     48 C.F.R. § 52.233-1 (Disputes Clause); |
| | \*   Federal Property and Administrative Services |
| THE UNITED STATES, | \*     Act of 1949, 40 U.S.C. § 490(h)(1); |
| | \*   Motion to Dismiss, RCFC 12(b)(1), 12(b)(6); |
| Defendant. | \*   Real Party In Interest, RCFC 17(a); |
| | \*   Receivership; |
| | \*   Standing; |
| | \*   Tenant Improvement Allowance; |
| | \*   Termination for Default. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Robert Clark MacKichan**, Holland & Knight, LLP, Washington, D.C., Counsel for Plaintiff.

**Matthew H. Solomson**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**MEMORANDUM OPINION AND ORDER**

**BRADEN,** *Judge.*

## I.    RELEVANT FACTUAL BACKGROUND.[1]

### A.    Solicitation For Offers No. 9MD0023.

On June 18, 2004, the General Services Administration ("GSA") issued Solicitation for Offers No. 9MD0023 ("Solicitation") and a Program of Requirements ("POR") for the design, finance, and construction of leased property for the National Oceanic and Atmospheric

---

[1] The facts cited herein were derived from: the May 12, 2009 Complaint ("Compl."); Plaintiff's Appendices In Support ("Pl. App. A-C"); and the Defendant ("Government")'s Exhibits In Support of the September 11, 2009 Motion To Dismiss ("Gov't Ex. 1-5").

Administration for Weather and Climate Prediction (the "Project").[2]  Pl. App. A-5-A-56.  The Project was to be a "best-value procurement for a design/build facility."  *Id.* at A-9.  The Solicitation and POR describe the base building requirements of the Project.  *Id.* at A-9, A-10, A-14, A-15.  Solicitation § 1.7(G)(1)(d) specifically required that all proposals include a Tenant Improvement Allowance[3] of $47.88 per square foot.  *Id.* at A-14.

Based on the Solicitation and POR, Maryland Enterprise, L.L.C. ("Plaintiff") prepared a budget for the construction of the base building and tenant improvements.  Compl. ¶ 10.  Plaintiff estimated a total development cost of $66,151,689, including $44,802,450 for the base building plus $10,820,880 for the Tenant Improvement Allowance.  *Id.* ¶ 11.  Plaintiff has represented to the court that it "secured a letter from its lender expressing the lender's intent to provide a construction loan . . . that included funds for the Tenant Improvement Allowance[.]"  *Id.* ¶ 12.[4]  No additional funds were provided for in the budget for other tenant improvements.  *Id.*

On July 19, 2004, Plaintiff submitted a timely proposal for Phase I of the Project.  *Id.* ¶ 13.  On September 21, 2004, the Government decided that Plaintiff's proposal was "one of the most highly rated" and invited Plaintiff to submit a proposal for Phase II.  *Id.*  On November 5, 2004, Plaintiff submitted a timely proposal for Phase II.  *Id.*  On December 23, 2004, the Government requested that Plaintiff submit a Final Revised Proposal by January 19, 2005.  *Id.* ¶ 14.  Thereafter, Plaintiff filed a timely Final Proposal.  *Id.*  Plaintiff provided proposed construction loan and financing information in the Final Revised Proposal, but the record to date does not provide the details of that financing.  *Id.* ¶ 15; *see also supra* n.4.

### B.    Lease Agreement No. GS-11B-01583.

On March 30, 2005, GSA notified Plaintiff that it was the successful bidder.  Compl. ¶ 16.  On September 2, 2005, the Government entered into Lease No. GS-11B-01583 ("the Lease"), with "Maryland Enterprise, L.L.C., a Delaware corporation c/o Opus East L.L.C., 2099 Gather Road, Suite 100, Rockville, MD 20850."  Pl. App. A-1.  The Lease had an initial term of 13 years, but GSA had an option to exercise a renewal for two consecutive ten-year terms.  *Id.*

---

[2] The Federal Property and Administrative Services Act of 1949 authorized GSA to acquire leasehold interests in real property for federal agencies in buildings and improvements that are in existence or will be erected and designed by the lessor.  40 U.S.C. § 490(h)(1).

[3] Tenant improvements are "all alterations for the Government demised area above the building shell buildout."  Pl. App. A-14.  The "Tenant Improvement Allowance" gives GSA "the sole discretion to direct disbursement of the Tenant Improvement Allowance funds in accordance with the [Solicitation]."  *Id.* at A-2.

[4] As of April 21, 2008, however, Bank of America is listed as having a secured claim of only $53,358,550 on the National Oceanic and Atmospheric Administration for Weather and Climate Prediction Building.  *In re Opus East, L.L.C.*, Case No. 09-12261 (Bankr. D. Del. July 1, 2009), Schedule D - Creditors Claims, at 2.  The court is not aware of any additional lender or source of credit for the Project.  Therefore, Plaintiff may not have secured sufficient funds to complete the Project as bid.

GSA's annual rent was $8,868,240.  *Id.*  In addition, GSA was required to pay for certain operating expense adjustments and tax adjustments.  *Id.*

Solicitation § 1.6 provided that: "The Lessor shall coordinate access with the [GSA] during construction to coordinate installation of [GSA] equipment and furniture.  Space will be accepted upon substantial completion in as many as eight phases, with the first phase being accepted no earlier than August 1, 2007.  Full occupancy is due no later than February 1, 2008, at which time all building construction and site work shall be completed, unless the Contracting Officer provides a specific written exception."  *Id.* at A-10.  When the initial occupancy date could not be met, the parties executed three Supplemental Lease Agreements ("SLA") on September 2, 2005 ("SLA No. 1"), on February 29, 2008 ("SLA No. 2"), and on July 11, 2008 ("SLA No. 3"), to adjust the completion date for the Project.  Gov't Ex. 1.

### C.     Tenant Improvement Allowance and Additional Tenant Improvements.

The Lease included a Tenant Improvement Allowance of $47.88 per square foot for a total amount of $10,820,880, after Plaintiff finalized a design with 266,000 square feet of usable space.  Pl. App. A-2.  The $10,820,880 Tenant Improvement Allowance was included in the annual full service rent and amortized at a return of zero percent over the course of the 13-year initial lease term.  *Id.*

Section 1.9(A) of the Solicitation, incorporated into the Lease, also provided that:

All Tenant Improvements required by [GSA] for occupancy shall be performed by the successful Offeror as part of the rental consideration, and all improvements shall meet the quality standards and requirements of this Solicitation, the design guidelines and GSA Form 3517X, General Clauses.  [*GSA*] *agrees to pay for all Tenant Improvements in excess of the Tenant Improvement Allowance in a lump sum payment(s)* (defined as a Tenant Improvement Contribution) *once accepted and approved by the Contracting Officer* pursuant to the Prompt Payment paragraph of the GSA Form 3517X.

Pl. App. A-15 (emphasis added).

In addition, Section 1.10(A)(1) of the Solicitation, provided that:

[*GSA*]*, at its sole discretion, shall make all decisions as to the usage of the Tenant Improvement Allowance*.  [GSA] may use all or part of the Tenant Improvement Allowance.  [GSA] may return to the Lessor any unused portion of the Tenant Improvement Allowance for a decrease in rent according to the amortization rate over the firm term.  [GSA] may also request additional Tenant Improvement Allowance from the Lessor.  *If available, the additional Tenant Improvement Allowance may be added to the rent in accordance with the negotiated terms, or [GSA] may pay lump sum for the additional Tenant Improvement Allowance.*

*Id.* at A-16 (emphasis added).

###### D.       Unilateral Change Orders.

The general clauses of the Lease, set forth in GSA Form 3517X (Pl. App. A-57), were derived from the Federal Acquisition Regulations ("FAR"), codified at 48 C.F.R. §§ 500-552. Clause 33, the Itemized Cost Proposal Clause, required Plaintiff to submit an itemized cost proposal for changes made by the Contracting Officer.  48 C.F.R. § 552.270-13.  Clause 34, the "Changes Clause," allowed the Contracting Officer to make changes within the scope of the Lease.  48 C.F.R. § 552.270-14.[5]  In this case, the Contracting Officer's change orders were issued as "Change Requests."  Compl. ¶¶ 27-28.

From January 26, 2006 to September 29, 2008, GSA unilaterally issued approximately 50 Change Requests.  Pl. App. B-1-B-7.  According to Plaintiff, these Change Requests amounted to approximately $37,000,000 in tenant improvements over and above the $10,820,880 Tenant Improvement Allowance specified in the Lease.  Compl. ¶ 32.  These Change Requests included: approximately $25,000,000 that GSA acknowledges exceed the Tenant Improvement Allowance;

---

[5] The Changes Clause provides that:

(a) The Contracting Officer may at any time, by written order, make changes within the general scope of this lease in any one or more of the following:

(1) Specifications (including drawings and designs);
(2) Work or services;
(3) Facilities or space layout; or
(4) Amount of space, provided the Lessor consents to the
 change.

(b) If any such change causes an increase or decrease in Lessor's cost of or the time required for performance under this lease, whether or not changed by the order, the Contracting Officer shall modify this lease to provide for one of the following:

(1) A modification of the delivery date;
(2) An equitable adjustment of the rental rate;
(3) A lump sum equitable adjustment; or
(4)  An  equitable  adjustment  of  the  annual  operating  costs  per ANSI/BOMA Office Area square foot specified in the lease.

(c) The Lessor shall assert its right to an adjustment under this clause within 30 days from the date of receipt of the change order and shall submit a proposal for adjustment.   Failure  to  agree  to  any  adjustment  shall  be  a  dispute  under  the Disputes [C]lause ([48 C.F.R. §] 52.233-1).  However, nothing in this clause shall excuse the lessor from proceeding with the changes as directed.

48 C.F.R. § 552.270-14.

approximately $10,000,000 that GSA denies are tenant improvements; and approximately $2,000,000 on which GSA has not taken a position.  Pl. App. B-1-B-7.

### E.    Plaintiff's Correspondence With The Contracting Officer.

On November 20, 2008, a letter was sent to the Contracting Officer stating that Plaintiff "has no alternative other than to stop work, effective . . . November 21, 2008, on the Tenant Improvements in excess of the Tenant Improvement Allowance of $10,820,880."  Pl. App. C-1. Specifically, "[b]ased on the content of the Solicitation For Offers, [Plaintiff] could not have anticipated and did not anticipate the enormity of the scope of the changes demanded by GSA." *Id.*  Plaintiff also renewed prior requests for progress payments to finance the cost of the tenant improvements in excess of the Tenant Improvement Allowance.  *Id.*  On November 21, 2008, Plaintiff stopped work on the Project.  *Id.* at C-3-C-5.

On November 26, 2008, Plaintiff sent a letter to notify the Contracting Officer of the work remaining to be accomplished.  *Id.*  On November 28, 2008, the Contracting Officer directed Plaintiff "to continue and/or commence construction and installation of all '[GSA] approved' tenant improvements as directed per Paragraphs 1.10 . . . and 3.15 . . . of the [Lease]." *Id.* at C-6.  The Contracting Officer also warned that Plaintiff's "clear expression of intent not to perform the Lease may constitute anticipatory repudiation which endangers performance of the Lease."  *Id.*

On December 12, 2008, Plaintiff's legal counsel notified the Contracting Officer that GSA's continued insistence on performance of extra tenant improvements, without payment, was a material breach of the Lease and a cardinal change.  *Id.* at C-8-C-10.  The Contracting Officer was informed that Plaintiff intended to suspend substantially all remaining work on the Project, unless the parties executed a bilateral modification of the Lease addressing progress payments. *Id.* at C-9.  On December 15, 2008, the Contracting Officer responded that, GSA viewed "any such suspension as anticipatory repudiation canceling any limited forbearance of termination for default rights."  *Id.* at C-11.  In addition, the Contracting Officer directed Plaintiff "to continue and/or commence construction and installation of all '[GSA] approved' tenant improvements and base building work as directed per the Lease."  *Id.*

On December 30, 2008, Plaintiff's legal counsel demanded that GSA "accept[] legal and financial responsibility for the scheduled delays, costs, and damages suffered by [Plaintiff] as a result of GSA failing to agree to the terms and conditions with respect to the substantial tenant improvements in excess of the tenant improvement allowance."  *Id.* at C-13.  On December 31, 2008, the Contracting Officer responded that GSA "is well aware of, and rejects, [Plaintiff's] erroneous interpretation of GSA's Lease with [Plaintiff], which requires [Plaintiff] to deliver the base building and tenant improvements on specific dates."  *Id.* at C-15.

On April 24, 2009, the Contracting Officer issued a cure notice regarding Plaintiff's "failure to diligently prosecute or pursue construction of the National Center for Climate and Weather Prediction (NCWCP) Building."  *Id.* at C-16.  The cure notice also stated that, "[b]ecause [Plaintiff] stopped making progress on the construction of the base building on December 15, 2008 and stopped making progress on the construction of tenant improvements on

November 21, 2008, [Plaintiff] is in breach of the requirement to diligently prosecute or pursue construction of the [building]." *Id.* The Contracting Officer further warned, "unless this condition is cured within twenty (20) days after receipt of this notice, the Government may terminate for default." *Id.*

## II.    PROCEDURAL HISTORY.

### A.    In The United States Court Of Federal Claims.

On May 12, 2009, Plaintiff filed a Complaint in the United States Court of Federal Claims, to appeal the Contracting Officer's April 24, 2009 cure notice and Final Decision seeking a declaratory judgment that GSA's additional tenant improvements in excess the Tenant Improvement Allowance of $10,820,800 was a breach of and cardinal change to the September 2, 2005 Lease. Compl. ¶¶ 52-62.

On July 13, 2009, after the parties canceled a scheduled settlement conference, the Government filed a Motion For An Enlargement Of Time to respond to the May 12, 2009 Complaint. On July 15, 2009, Plaintiff filed an Opposition. On July 16, 2009, the Government filed a Response. On July 20, 2009, Plaintiff filed a Motion For Leave To File A Sur-Reply. On July 22, 2009, the court convened a status conference. Thereafter, the court denied Plaintiff's Motion To File A Sur-Reply, but granted the Government's Motion For An Enlargement Of Time.

### B.    In The United States Bankruptcy Court For The District Of Delaware.

On June 29, 2009, Opus East, L.L.C. ("Opus East"), a member of the Opus Group,[6] transferred its ownership interest in Plaintiff to GAMD, L.L.C.[7] Gov't Ex. 3. On July 1, 2009, Opus East filed a petition in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), that imposed an automatic stay on the modification or cancellation of Opus East contracts with any third parties, including Plaintiff. Gov't Ex. 2. On July 6, 2009,

---

[6] The Opus Group is a Minneapolis, Minnesota based "full-service real estate development company . . . recognized as a national leader in office, industrial, retail, multifamily, government, and institutional development." http://www.opuscorp.com/overview/ Pages/overview.aspx (last visited January 25, 2010). In the 1980's, the Opus Group established regional operating companies "to provide services with geographic areas across the United States." *Id.* Among the corporations that are affiliated with the Opus Group is the Opus Corp., the parent company of two operating companies: Opus East L.L.C. and Opus West L.L.C. *Id*; *see also* http://washington.bizjournals.com/washington/stories/2009/06/29/daily59.html ("Opus East filed for Ch. 7 liquidation"). In the spring of 2009, two other "Opus operating companies, Opus South and Hill County Galleria were put into Chapter 11 bankruptcy proceedings." *Id.* Two other "independent operating companies of the Opus Group, Opus North Corp. and Opus Northwest L.L.C." were reported as having "healthy balance sheets." *Id.*

[7] GAMD, L.L.C. "is an entity . . . owned by two family trusts of the Opus family [members], all of the Opus companies are owned by the trust . . . within the Opus family of companies." TR at 83.

Bank of America moved in the Bankruptcy Court to lift the automatic stay in Maryland State Court to allow Bank of America to request the appointment of a receiver to protect Bank of America's secured interest in the Project. Gov't Ex. 4. On July 16, 2009, the Bankruptcy Court granted Bank of America's motion. *Id.*

### C.      In The Circuit Court For Prince George's County, Maryland.

On August 13, 2009, at the request of Bank of America, the Circuit Court for Prince George's County, Maryland ("Maryland Circuit Court") issued an Order ("Receivership Order") that appointed a Receiver to protect and preserve Bank of America's interest in:

> [A]ll land, buildings and structures, leases, fixtures, contracts and moveable personal property and other personal property . . . plus all accounts, including bank, security deposit and operating accounts, and all the rents, prepaid rents, security deposits, storage fees, leases, lease payments, royalties, issues, profits, revenue, income thereof, insurance, condemnation awards and proceeds . . . books and records, plans and specifications, contracts, agreements, leases and sub-leases and all of the documents relating to the construction of the [National Oceanic and Atmospheric Administration for Weather and Climate Prediction] building.

Gov't Ex. 5 at ¶ 2.

In addition, the Receivership Order required Plaintiff to "surrender possession and control" of the Lease premises and provide the Receiver with "possession of all reasonably ascertainable assets relating to the development and construction of the Project." *Id.* The Receivership Order remains in effect until Bank of America's loan to Plaintiff is paid in full or until Bank of America and Plaintiff resolve the alleged default and control of the Project is transferred back to Plaintiff. *Id.*

The Receivership Order also instructs the Receiver to have "as his primary objective the completion of the Project, and preservation of the [L]ease with GSA and ground lease, and the preservation of the value of the Project for the benefit of all interested parties." *Id.* at ¶ 7. Specifically, the Receiver is authorized to "complete the construction of all improvements on the Property (including tenant improvements)." *Id.* at ¶ 7(d). In addition, the Receiver "is to negotiate with the GSA to attempt to cure any existing defaults under the lease with [Plaintiff] and may agree to such modifications of the lease, in consultation with [Bank of America], as he deems appropriate to accomplish the goal of completing and preserving the value of the Project and delivering possession to the GSA." *Id.* at ¶ 7(e). The Receivership Order prevents Plaintiff "from in any way interfering with the Receiver in possession and operation of the Receivership Assets" without a further order of the Maryland Circuit Court. *Id.* at ¶ 2.

The Maryland Circuit Court, however, took judicial notice of this case before the United States Court of Federal Claims in the Receivership Order and stated that the "Receiver shall have no authority under this Order to participate in any way in [the United States Court of Federal Claims] litigation," without first obtaining permission. *Id.* at ¶ 7(i). Likewise, before Bank of America may intervene in this litigation, it must "give 15 days written notice to [Plaintiff] and

meet and confer with [Plaintiff] before filing such motion." *Id.* The Maryland Circuit Court also held that Bank of America has "a properly perfected security interest in any proceeds recovered in the [United States Court of Federal Claims] litigation." *Id.* Therefore, if Plaintiff recovers any damages in this case, it "shall pay the proceeds to Bank of America to the extent of any deficiency on the loan." *Id.*

\* \* \*

A few weeks after the Receivership Order was issued, on September 11, 2009, the Government filed a Motion To Dismiss For Lack Of Jurisdiction And Failure To State A Claim ("Gov't Mot."), in this case before the United States Court of Federal Claims. On October 13, 2009, Plaintiff filed an Opposing Brief ("Pl. Opp."). On October 30, 2009, the Government filed a Reply ("Gov't Reply").

On January 6, 2010, the court heard oral argument on the Government's Motion To Dismiss ("TR1-100").

III.    **DISCUSSION.**

A.    **THE GOVERNMENT'S SEPTEMBER 11, 2009 MOTION TO DISMISS, PURSUANT TO RCFC 12(b)(1).**

1.    **The Parties' Arguments.**

a.    **The Government's Argument.**

On September 11, 2009, the Government moved to dismiss the May 12, 2009 Complaint, pursuant to RCFC 12(b)(1), arguing that Plaintiff does not have standing. Gov't Mot. at 9. The state court-appointed Receiver is now responsible for performing the Lease. *Id.* Therefore, Plaintiff "cannot plausibly ask the court to declare [Plaintiff's] rights and obligations under a contract that [Plaintiff] is no longer performing, has no ability to perform, and, indeed, is prohibited from performing pursuant to a court order." *Id.* at 11. A declaratory judgment that Plaintiff does not have to perform certain change orders "would be nothing more than an advisory opinion," since the Government is no longer looking to Plaintiff to complete the change orders. *Id.* In redressability terms, there is no "likelihood that the requested relief will redress the alleged injury," and Plaintiff "personally would [not] benefit in a tangible way from the court's intervention." *Id.*

Although the Receivership Order restricts the Receiver from participating in this case without approval of the Maryland Circuit Court, that fact does not confer standing on Plaintiff to pursue this action. *Id.* at 11 n.5; *see also* Gov't Ex. 5 at ¶ 7(i). Plaintiff consented to the Receivership Order and cannot collaterally attack the content in this court. *Id.* In *Larson* v. *Correct Craft, Inc.*, 569 F.3d 1319 (Fed. Cir. 2009), the United States Court of Appeals for the Federal Circuit held that an inventor who assigned his patent rights did not have Article III standing to pursue a claim for infringement, without having first to "obtain a rescission of the patent assignments" in the state court. *Id.* at 1326-27. Likewise, in this case,

Plaintiff would need to oust the Receiver to have standing to maintain the May 12, 2009 Complaint.  Gov't Mot. at 12 n.5.

The May 12, 2009 Complaint is also moot, because the redressability prong of the standing inquiry is coterminous with the mootness inquiry.  *Id.* at 10.  The Receiver, not Plaintiff, is now charged with completing the Project, including all required tenant improvements.  *Id.* at 11.  Plaintiff has no ability to complete the Project, because it did not seek relief from the automatic stay.  In contrast, Bank of America obtained relief from the automatic stay, so that it could seek and obtain the appointment of a Receiver invested with the power to complete the Lease.  *Id.*  In *Avtel Services, Inc.* v. *United States*, 501 F.3d 1259 (Fed. Cir. 2007), the United States Court of Appeals for the Federal Circuit held that it "only possesses jurisdiction over [Plaintiff's] appeal if it can be awarded the relief it seeks."  *Id.* at 1260.  In *Avtel*, because the plaintiff made a "general assignment to another party to liquidate its assets and distribute proceeds to creditors," the appellate court dismissed the complaint for "want of jurisdiction."  *Id.*  In this case, the Receiver has been authorized to complete Plaintiff's Lease obligations.  Gov't Mot. at 12.  Therefore, Plaintiff is in the same situation as the plaintiff in *Avtel*.  *Id.*

### b.    Plaintiff's Response.

Plaintiff responds that the court has jurisdiction to decide the claims in the May 12, 2009 Complaint, because the requirements of Article III standing are met.  Pl. Opp. at 13.  The Government does not contest that the first two elements of Article III standing have been satisfied, *i.e.*, Plaintiff has suffered an "injury in fact" and there is a "causal connection between the injury and the conduct complained of."  *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

As for "redressability," the Government's sole standing argument is that the Receivership Order precludes Plaintiff from satisfying that element of Article III standing.  Gov't Mot. at 11-12.  The flaw in this argument is that it mischaracterizes the Receivership Order as extinguishing Plaintiff's legal and economic interest in the Lease.  Pl. Opp. at 16.  The Receivership Order merely transfers temporary possession and control of the leased premises and related assets to the Receiver, but not ownership.  *Id.*  Accordingly, the Maryland Circuit Court expressly excluded the claims at issue in this litigation, *i.e.*, Plaintiff remains a party to the Lease and has an economic interest therein.  *Id.*

A declaratory judgment will redress Plaintiff's loss of temporary possession and control of the leased premises, because Plaintiff could then "seek to dissolve the Receivership Order on the ground that any default under the loan agreements was excused by GSA's wrongful conduct."  *Id.*  Therefore, the Receivership Order does not preclude Plaintiff from realizing a tangible benefit from the declaratory relief sought in the May 12, 2009 Complaint.  *Id.* at 18.  A declaratory judgment will establish that Plaintiff may elect from all available options stemming from a cardinal change, including refusing to perform the cardinal change, avoiding or canceling the Lease, and potentially recovering damages.  *Id.*

The Government's reliance on *Larson*, 569 F.3d at 1326-27, is misplaced. Pl. Opp. at 19. The patent assignment in that case "transferred all of [plaintiff's] interest" in the invention. *Larson*, 569 F.3d at 1322. In contrast, the Receivership Order in this case did not transfer title nor any of Plaintiff's economic interest in the Lease to the Receiver, but only transferred temporary possession and control and expressly reserved Plaintiff's right to pursue this lawsuit. Pl. Opp. at 19. Since the terms of the Receivership Order preserve Plaintiff's "concrete financial interest" in the performance of the Lease, *Larson* is inapplicable. *Id.* at 20.

Moreover, the May 12, 2009 Complaint has not been rendered moot either by the Receivership Order or the Opus East bankruptcy. *Id.* In *County of Los Angeles* v. *Davis*, 440 U.S. 625 (1979), the United States Supreme Court established a two-part test to determine whether a claim is moot: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* at 681 (quotations and citations omitted). The Government cannot satisfy either part of this test. Pl. Opp. at 20. First, the Government has failed to establish that the cardinal change to the Lease cannot be reasonably expected to recur, because GSA continues to insist that it can unilaterally order the additional tenant improvements, without a bilateral Supplemental Lease Agreement. *Id.* Second, the Government cannot show that the Receivership Order has "completely and irrevocably eradicated" the effects of GSA's material breach. *Id.* In fact, GSA's wrongful breach is still injuring Plaintiff's interests by making performance unfeasible. *Id.* at 21.

It is also erroneous for the Government to suggest that the May 12, 2009 Complaint is moot, because of the bankruptcy filing of Opus East. *Id.* The Bankruptcy Code provides a process for the termination of executory contracts. To the extent that Plaintiff's alleged contract with Opus East is not terminated by the bankruptcy proceeding, Plaintiff can seek relief from the Bankruptcy Court to terminate that agreement and engage another general contractor to finish the Project. *Id.* As such, it is disingenuous for the Government to suggest that Opus East's bankruptcy prevents Plaintiff from performing or has "completely and irrevocably eradicated" the effects of GSA's material breach. *Id.* at 22.

Moreover, *Avtel* also has no application. The Federal Circuit concluded that the plaintiff could not be awarded the relief it sought in that case, because it was liquidating assets and going out of business. 501 F.3d at 1260-61. In this case, however, Plaintiff is neither in bankruptcy nor going out of business. Pl. Opp. at 22. GSA's cardinal change in ordering $37,000,000 of additional tenant improvements, however, has made it impossible for Plaintiff to obtain additional financing for the Lease in the current economic climate, in turn causing Plaintiff to suspend work and triggering the default notice from Bank of America. *Id.* at 22-23.

The May 12, 2009 Complaint is limited to requesting a declaration that will resolve a nonmonetary dispute between the parties regarding their rights and obligations with respect to the Government's unilateral order that Plaintiff make substantial additional tenant improvements. *Id.* at 25. The CDA does not require a plaintiff to wait until it has suffered quantifiable monetary damages before initiating a nonmonetary suit. *Id.* (citing *Todd Constr., L.P.* v. *United States*, 85 Fed. Cl. 34, 41 (2008)). Therefore, this case is ripe for declaratory relief, as "it involves a live dispute involving a fundamental question of contract interpretation regarding the [Plaintiff's]

obligation to perform." Pl. Opp. at 26. In fact, the United States Court of Appeals for the Federal Circuit has recognized that a declaratory judgment is "particularly appropriate" when a contractor is objecting to whether it is obligated to perform. *Alliant Techsystems, Inc.* v. *United States*, 178 F. 3d 1260, 1271-72 (Fed. Cir. 1999) (holding that the [United States] Court of Federal Claims did not abuse its discretion by entering declaratory relief, where the plaintiff asserted that it had no contractual obligations to perform at all). Likewise, declaratory relief is appropriate here, because Plaintiff is seeking a declaration that it has no obligation to perform the additional tenant improvements as they are outside the scope of the Lease. Pl. Opp. at 26.

### c.    The Government's Reply.

The Government replies that whether Plaintiff has standing to seek declaratory relief depends upon the meaning and effect of the Receivership Order under Maryland state law. Gov't Reply at 1. For the court to determine that Plaintiff has standing, it would have to "ignore almost every provision" of the Receivership Order. *Id.* at 3. The Receivership Order transfers every asset and liability of the Project, with the exception of this lawsuit, to the Receiver. Gov't Ex. 5 at ¶ 2. The Receiver's interest includes "all land, buildings, and structures, leases . . . and other personal property," as well as "all accounts, including bank, security deposit, and operating accounts . . . and all of the documents relating to the construction of the NOAA facility." *Id.* The Receivership Order refers to those items as "the Receivership Assets," leaving no doubt that Plaintiff's ownership interest in the Lease resides with the Receiver. *Id.* In addition, the Receivership Order prohibits Plaintiff "from in any way interfering with the Receiver in the possession and operation of the Receivership Assets." *Id.* The Receivership Order commands the Receiver to "negotiate with the GSA to attempt to cure any existing defaults under the lease [with Plaintiff] and may agree to such modifications of the lease . . . as he deems appropriate." *Id.* at ¶ 7(e). The Receiver's "primary objective" is the completion of the Project and preservation of the Lease and value of the Project for all interested parties. *Id.* at ¶ 7. As such, the Receiver is specifically authorized "to complete the construction of all improvements on the property (*including tenant improvements*)." *Id.* at ¶ 7(d) (emphasis added).

Plaintiff does not address any of the foregoing provisions, but instead argues that, because the Receiver may not intervene in this litigation, Plaintiff has standing. Pl. Opp. at 14-19. The decision of the Maryland Circuit Court allowing Plaintiff to maintain control over this suit does not, *ipso facto*, satisfy the requirements of Article III standing. Gov't Reply at 4. Indeed, it is questionable whether Plaintiff even has the ability to agree to a settlement of this litigation, given that: the Receiver currently is tasked with completing the same tenant improvements that Plaintiff challenges; and any settlement would necessitate a modification of the Lease, a power reserved to the Receiver. *Id.* Therefore, Plaintiff has not demonstrated how control of this lawsuit confers standing. *Id.* at 5.

Plaintiff's view of the Receivership Order is also unsupported by Maryland law. *Id.* Plaintiff's position is that the Receiver only has "temporary possession and control (but not ownership) of the leased premises and related assets." Pl. Opp. at 16. In *Mathias* v. *Segaloff*, 51 A.2d 654, 657 (Md. 1947), the Supreme Court of the State of Maryland held that receivership assets do not remain with the debtor, but rather are held by the court, with the receiver acting as the court's agent. *Id.* ("Property taken in a receivership proceeding is in the custody of the court

and the receivers are merely the agents of the court to hold it and manage it."). The critical holding of *Mathias* is that a debtor's title, to the extent it exists, is a nullity against the court's power over assets that are delegated to the receiver. Gov't Reply at 6. Although Plaintiff denies that it is insolvent, the Maryland Court of Special Appeals has held that "the appointment of a receiver over a corporation is generally equivalent to a suspension of its corporate functions, and of all authority over its property and effects." *Hamzavi* v. *Bowen*, 730 A.2d 274, 276-77 (Md. App. 1999) (quotations and citations omitted). Therefore, for all practical purposes, Plaintiff has no title to the Lease, no authority to perform the Lease, no power to modify the Lease, and no power to initiate any other action based upon the Lease. Gov't Reply at 6-7. Accordingly, Plaintiff also has no standing to seek an interpretation of the Lease. *Id.* at 7.

The fact that the Receivership Order reserved Plaintiff's right to prosecute this lawsuit is insufficient to confer standing. *Id.* The right to sue for a declaratory judgment cannot be segregated from the Lease, control of which resides in the Receiver. *Propat Int'l Corp.* v. *RPost, Inc.*, 473 F.3d 1187, 1190-94 (Fed. Cir. 2007) (holding, in a patent infringement case, that plaintiff lacked standing where it held a conditional right to license a patent and enforce license agreements, but did not have the right to transfer the patent). In *Propat*, the appellate court explained that, "[t]he right to dispose of an asset is an important incident of ownership, and such a restriction on that right is a strong indicator" that plaintiff did not have sufficient rights to institute a suit. *Id.* at 1191. Likewise, in this case, Plaintiff does not have the "right to dispose" of the Lease and, except for the right to maintain this suit, does not have any power over the Lease or the Project generally. Gov't Reply at 8. Even if Plaintiff were correct in asserting legal title to the Lease and associated assets, the terms of the Receivership Order deprive Plaintiff of standing. *Id.* (citing *Propat*, 473 F.3d at 1189) (defining ownership "for standing purposes" as the party with "all substantial rights" in the patent). In this case, the Receiver holds "all substantial rights" in the Lease. Gov't Reply at 9.

The Government also posits four additional jurisdictional arguments. First, assuming *arguendo* that the Receivership Order does not preclude Plaintiff from having standing, nevertheless Plaintiff has violated the anti-assignment statutes, "by effectuating a transfer of the [Lease] and project assets, in addition to potential future CDA claims." *Id.* at 9 n. 4 (citing 31 U.S.C. § 3727; 41 U.S.C. § 15). If so, neither Plaintiff nor the Receiver would have standing. *NGC Inv. & Dev., Inc.* v. *United States*, 33 Fed. Cl. 459, 463 (1995) ("Because NGC assigned its contract in violation of the Act . . . NGC has lost its right to bring a claim.").

Second, the court's cases analyzing RCFC 17(a) ("real party in interest") also support the Government's position. Gov't Reply at 9. For example, in *General Dynamics Corp.* v. *United States*, 47 Fed. Cl. 514 (2000), the court held that a plaintiff was the "real party in interest," in litigation concerning a cost-reimbursement contract, under which "all payments from the Government pass through [a subsidiary] to [plaintiff], and [plaintiff] is ultimately liable for the contract's performance." *Id.* at 531-32. In this case, since the Receiver holds the Receivership Assets and "bears responsibility if the contract is not properly performed," the Receiver is the real party in interest under RCFC 17(a). Gov't Reply at 9-10; *see also Aaron* v. *United States*, 65 Fed. Cl. 29, 31 (2005) ("Once an asset becomes part of the bankruptcy estate . . . [the] trustee therefore becomes the real party in interest for purposes of RCFC 17(a).").

Third, the May 12, 2009 Complaint seeks a declaratory judgment that Plaintiff does not have to perform certain change orders, but then asserts that those change orders constitute a cardinal change. Compl. ¶¶ 60-62. The finding of a cardinal change allows Plaintiff either to: end the Lease and seek damages; or perform the change orders and seek an equitable adjustment. Gov't Reply at 10-11. Plaintiff's standing to seek a declaratory judgment, however, cannot be based on the ability to perform the change orders, because of the Receivership Order. *Id.* at 11. Moreover, even if the court were to find a cardinal change, Plaintiff cannot terminate the Lease. Gov't Ex. 5 at ¶ 7 ("The Receiver shall have as his primary objective the completion of the Project, and preservation of the lease with GSA and the ground lease, and the preservation of the value of the Project for the benefit of all interested parties."). Consequently, a declaratory judgment does not yield Plaintiff anything. This is why Plaintiff "variously argues" both that a declaratory judgment may redress Plaintiff's possible economic injury, and that such relief will redress Plaintiff's injury if the receivership is dissolved. Gov't Reply at 11 (citing Pl. Opp. at 3, 12, 14-15, 17). To the extent meaningful declaratory relief depends upon the dissolution of the receivership, the court lacks jurisdiction, because "an Article III court cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas* v. *City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) (quotations and citations omitted). Therefore, whether a declaratory judgment would redress any of Plaintiff's alleged harms is speculative at best. Gov't Reply at 12.

In the alternative, the court should decline to issue declaratory relief, because: "In responding to [a request for declaratory relief], the court . . . is free to consider the appropriateness of such relief, including whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." *Alliant Techsystems*, 178 F.3d at 1271. In this case, the Lease has not been completed and declining to issue declaratory relief will not deny the Receiver or Plaintiff "any meaningful relief." Gov't Reply at 13. The court should decline to issue such relief, because "it is possible . . . that the unnecessary resolution of the . . . issue at the present might constitute a hypothetical rendering of the law – an advisory opinion long recognized as being prohibited." *Liberty Mutual Ins. Co.* v. *United States*, 70 Fed. Cl. 37, 56-57 (2006).

### 2. The Court's Resolution.

#### a. The Court Has Jurisdiction To Adjudicate The Contract Disputes Act Claim For Declaratory Relief.

The jurisdiction of the United States Court of Federal Claims is established by the Tucker Act, 28 U.S.C. § 1491. This Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute and it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [it] whenever a substantive right . . . exists." *United States* v. *Testan*, 424 U.S. 392, 398 (1976). Therefore, a plaintiff must identify and plead an independent

contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. *Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages."). The burden of establishing jurisdiction falls upon the plaintiff. *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden to allege facts sufficient to establish jurisdiction resides with plaintiff); *see also* RCFC 12(b)(1).

The May 12, 2009 Complaint asserts that the United States Court of Federal Claims has jurisdiction "pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. §§ 601-13 [("CDA")]," to adjudicate a claim on an alleged breach of the Lease generally and a claim that the additional tenant improvements unilaterally ordered by GSA were a cardinal change to the Lease. Compl. ¶¶ 6, 52-62.

Pursuant to the CDA, "[a]ll claims by a contractor against the government relating to the contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). As evidenced therein, Plaintiff notified the Contracting Officer in writing of a claim that the Government's unilateral change orders, in excess of the Tenant Improvement Allowance, was a breach and cardinal change of the Lease. Pl. App. C-1-C-16. The Government does not dispute that the written notice requirement of the CDA has been met. Gov't Mot. at 14-15; *see also* TR at 27 (GOVERNMENT COUNSEL: "[T]his Court has CDA jurisdiction to issue non-monetary relief in the form of a declaratory judgment interpreting contract terms. And . . . Plaintiffs have in fact met the requirement for filing a CDA claim for non-monetary relief.").

Therefore, the court has jurisdiction to adjudicate the May 12, 2009 claims for declaratory relief. *Alliant Techsystems*, 178 F.3d at 1268 ("As amended in 1992, the Tucker Act gives the Court of Federal Claims jurisdiction 'to render judgment upon any claim by or against . . . a contractor under section 10(a)(1) of the Contract Disputes Act, including [certain specific kinds of non-monetary disputes], and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of the [CDA].'") (quoting 28 U.S.C. § 1491(a)(2)).[8]

---

[8] The May 12, 2009 Complaint requests "all remedies available for material breach of contract." Compl. ¶ 7. Therefore, the Government correctly argues that the May 12, 2009 Complaint does not satisfy the CDA's requirement that a claim for monetary relief must state a sum certain. Gov't Mot. at 16. During briefing, Plaintiff clarified that the May 12, 2009 Complaint "is devoid of any request that this Court award monetary relief," but instead is "limited to a series of declaratory statements regarding the parties' rights and obligations under the [September 2, 2005] Lease that [Plaintiff] requests . . . the Court enter as a declaratory judgment." Pl. Opp. at 25.

**b.** **The August 13, 2009 Receivership Order Does Not Deprive Plaintiff Of Standing And Does Not Render The May 12, 2009 Complaint Moot.**

The United States Supreme Court has stated that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005). The party invoking federal jurisdiction "bears the burden to establish standing for each type of relief sought." *Summers* v. *Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009). Specifically, to establish standing, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury [also must be] fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlow Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000); *see also Steel Co.* v. *Citizens For A Better Env't*, 523 U.S. 84, 103-04 (1998) ("[The] triad of injury in fact, causation, and redressability . . . comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.").

Although the Government did not directly contest the first two elements of standing, nevertheless, the court has an obligation to ensure jurisdiction is proper. *View Eng'g, Inc.* v. *Robotic Vision Systems, Inc.*, 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise it or not."). Whether Plaintiff suffered injury in fact depends upon the effect of the August 13, 2009 Receivership Order on Plaintiff's interest in the September 2, 2005 Lease.

The Receivership Order defines "Receivership Assets" as: "all land, buildings, and structures, leases . . . and other personal property," as well as "all accounts, including bank, security deposit, and operating accounts . . . and all of the documents relating to the construction of the NOAA facility." Gov't Ex. 5 at ¶ 2. The Receivership Order is clear that the Receiver has control of all of the assets. *Id.* ("[T]he Court appoints the Receiver to take possession of all reasonably ascertainable assets relating to the development and construction of the Project, including, without limitation the checkbook for construction accounts, copies of any blueprints, surveys, permits, bonds, surety contracts, insurance licenses, local authorizations, or any other document or asset relating to the development or construction of the Project on the Property, or the completion thereof."). The Receivership Order also authorizes the Receiver to negotiate with GSA "to attempt to cure any existing defaults under the lease with [Plaintiff] and [the Receiver] may agree to such modification of the lease, in consultation with the Agent, as he [or she] deems appropriate to accomplish the goal of completing and preserving the value of the Project and delivering possession to GSA." *Id.* at ¶ 7(e). In addition, the Receiver may "negotiate, and . . . make, enter into, or modify contracts or agreements affecting any part or all of the Receivership Assets including, without limitation, any and all leases affecting the Property, and to immediately terminate any existing contract, agreement, or instrument which is not . . . deemed commercially reasonable or beneficial to the operation of the Receivership Assets and reasonably necessary to preserve the value of the Project for the benefit of all interested parties." *Id.* at ¶ 19.

In addition, the Receivership Order enjoins Plaintiff "from collecting or attempting to collect, rents and profits of the Receivership Assets and from interfering in any manner with the management of the Receivership Assets by the Receiver until further order" of the Maryland Circuit Court. *Id.* at ¶ 13.

The Maryland Circuit Court, however, took "judicial notice" of this proceeding and held that the Receiver "shall have no authority under this Order to participate in any way in the GSA litigation . . . unless and until [the Receiver] obtains an Order of [the Maryland Circuit] Court permitting him to do so." *Id.* at ¶ 7(i). Further, the Receivership Order contemplated that Plaintiff may prevail on the CDA claims in this litigation, as it requires Plaintiff "to pay [any] proceeds to Bank of America to the extent of any deficiency in the loan." *Id.*; *see also* TR at 15 (GOVERNMENT COUNSEL: "[W]e don't argue that the [R]eceivership [O]rder did not allocate ownership of the claim[.]"). Therefore, the court has determined that the Receivership Order did not deprive Plaintiff of the ability to claim breach of and a cardinal change to the September 2, 2005 Lease. As such, Plaintiff has established a legally protected economic interest that is "concrete and particularized and . . . actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.

The second requirement of standing, causation, requires a plaintiff to prove "a causal connection between the injury and the conduct complained of." *Id.* at 560-61. The May 12, 2009 Complaint alleges that GSA unilaterally ordering approximately $37,000,000 in additional tenant improvements above the Tenant Improvement Allowance was a material breach and a cardinal change to the Lease. Compl. ¶¶ 60-62. Due to the amount of additional tenant improvements ordered, Plaintiff stopped working on the Project and filed a claim with the Contracting Officer. Pl. App. C-1-C-17; *see also* TR at 46 (PLAINTIFF'S COUNSEL: "And it got to the point, in fact, where these tenant improvements, what the [GSA] was requesting, are so intermingled with everything else that had to be done, that it just made no sense to continue."). Therefore, the court has determined that Plaintiff has established a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560-61.

As for the requirement of redressability, a plaintiff must establish a "likelihood that the requested relief will redress the alleged injury" and that the plaintiff will "personally benefit in a tangible way from the court's intervention." *Steel Co.*, 523 U.S. at 103, 104 n.5. In other words, an alleged injury to a legally protected interest is considered redressable, if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotations and citations omitted). The Government argues that Plaintiff does not have a redressable injury, because the August 13, 2009 Receivership Order prevents Plaintiff from "personally benefit[ing] in a tangible way" from any relief this court may provide. Gov't Mot. at 11. Plaintiff counters that the Government "mischaracterizes the Receivership Order as permanently extinguishing [Plaintiff's] legal and economic interests in the Lease . . . nothing in the Receivership Order terminates [Plaintiff's] ownership interests in the leased premises or its interest in the economic benefits flowing from the Lease." Pl. Opp. at 16.

The August 13, 2009 Receivership Order did not deprive the court from adjudicating the claims alleged in the May 12, 2009 Complaint, because under Maryland law, a receiver "is not vested with any estate in the property, but is merely a custodian of the property for the court." *In*

*re Careful Laundry, Inc.*, 104 A.2d 813, 820 (Md. 1954).   Therein, the Maryland Court of Appeals explained the role of a receiver as follows:

> He is an officer of the court, and the fund or property entrusted to his care is regarded as being in *custodia legis*, to await the ultimate disposal thereof by the court, according to the rights and priorities of the parties concerned.   The court itself has the care of the property, by its receiver, and that officer, being the mere creature of the court, has no powers other than those conferred upon him by the court, or derived from its established practice.   His appointment does not change the title to the property, or create any lien upon the same, in favor of any of the parties interested; his holding being for the benefit of the party who may be ultimately determined to be entitled.

*Id.* at 820-21 (quotations and citations omitted).

In this case, the appointment of the Receiver did not "change the title to the property . . . in favor of any of the parties interested."   *Id.*  For this reason, the Maryland Circuit Court expressly took "judicial notice" of this litigation and prohibited the Receiver from seeking to intervene, in effect recognizing that Plaintiff retains an economic interest in the Lease to maintain this suit.  Gov't Ex. 5 at ¶ 7(i).  Thus, the court also does not view the holding in *Avtel* to be relevant.  501 F.3d at 1260-61.  In this case, Plaintiff did not make a "general assignment to another party to liquidate its assets[,]" and the August 13, 2009 Receivership Order did not deprive Plaintiff of its economic interest in the Lease.  *Id.*

Therefore, the court has determined that Plaintiff has an economic interest in the Lease and leased premises and may "personally benefit in a tangible way from [this court's] intervention," sufficient to satisfy the redressability requirement.  *Steel Co.*, 523 U.S. at 104 n.5.[9]

---

[9] The Government's Reply made four additional arguments for why the May 12, 2009 Complaint should be dismissed pursuant to RCFC 12(b)(1).  First, the Government argued that, if Plaintiff is correct about the limited nature of the August 13, 2009 Receivership Order, Plaintiff is in violation of the Anti-Assignment Acts.  Gov't Reply at 9 n.4.  Under the Anti-Assignment Acts, an "assignment" is defined as "a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim."  31 U.S.C. § 3727(a)(1).  In addition, under these Acts, "[n]o contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned."  41 U.S.C. § 15(a).  The appointment of the Receiver did not change title to the property so that Plaintiff transferred the interest of the Lease to the Receiver in violation of the Anti-Assignment Acts.  41 U.S.C. § 15(a).  Moreover, Plaintiff has not transferred or assigned any part of its claim to the Receiver.  31 U.S.C. § 3727(a)(1).

Second, the Receivership Order did not transfer title of the Lease to the Receiver so, at this juncture, Plaintiff remains the "real party in interest."  *In re Careful Laundry, Inc.*, 104 A.2d at 820.  Even if the Receivership Order did cause the Receiver to become the "real party in interest" in this litigation, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable amount of time has been

For the same reasons discussed in the court's standing analysis, the May 12, 2009 Complaint is not moot. Although the Receiver is currently tasked with performing the change orders, the appointment of the Receiver did not affect Plaintiff's economic interest in the Lease. Therefore, Plaintiff maintains a sufficient economic interest in the Lease that the claims in the May 12, 2009 Complaint are not moot.

### B.  THE GOVERNMENT'S SEPTEMBER 11, 2009 MOTION TO DISMISS, PURSUANT TO RCFC 12(b)(6).

#### 1.  The Parties' Arguments.

##### a.  The Government's Argument.

In the alternative, the Government argues that the May 12, 2009 Complaint should be dismissed, pursuant to RCFC 12(b)(6), for failure to state a claim upon which relief can be granted. Gov't Mot. at 16. The plain language of the September 2, 2005 Lease requires Plaintiff to perform tenant improvements in excess of the Tenant Improvement Allowance. *Id.* at 17-19. Plaintiff's contrary interpretation ignores Solicitation § 1.9, that specifically contemplates tenant improvements "in excess of" the Tenant Improvement Allowance. Pl. App. A-15 ("The Government agrees to pay for all Tenant Improvements in excess of the Tenant Improvement Allowance in a lump sum payment (defined as a Tenant Improvement Contribution) once accepted and approved by the Contracting Officer pursuant to the Prompt Payment paragraph of the GSA Form 3517X."). It is true that Solicitation § 1.10 does not mention the Tenant Improvement Contribution. The reason is that Solicitation § 1.10 only addresses the circumstances under which GSA may make unilateral adjustments to the negotiated rental rate to prevent GSA from amortizing the cost of changes in excess of the Tenant Improvement Allowance over the entire lease term, without Plaintiff's approval. *Id.* at 19-20.

The September 2, 2005, February 29, 2008, and July 11, 2008 Supplemental Lease Agreements, also preclude Plaintiff's breach of contract claim as a matter of law. *Id.* at 20. Therein, both parties released each other from certain claims and established new dates by which Plaintiff was required to have the Project ready for occupancy. *Id.* Almost all of the challenged tenant improvement orders were issued prior to the SLA's. For example, on February 29, 2008, the parties executed SLA No. 2, wherein Plaintiff recognized that "in the event that the premises will not be 80% complete by the Delivery Date . . . the Lease provides the Government the right

---

allowed for the real party in interest to ratify, join, or be substituted into the action." RCFC 17(a)(3). To date, no other entity has come forward asserting that status.

Third, Plaintiff's standing to seek a declaratory judgment cannot be based on the ability to perform the change orders, because of the Receivership Order. Gov't Reply at 11. The court, however, has determined that the August 13, 2009 Receivership Order did not affect Plaintiff's economic interest in the Lease, and that Plaintiff has standing to maintain this suit.

Fourth, the court should decline to issue declaratory relief, pursuant to *Alliant Techsystems*. Gov't Reply at 13. The court addresses this argument below.

to either seek to terminate the Lease or extend the Delivery Date." Gov't Ex. 1. Plaintiff agreed to modify the original delivery date for Project from February 1, 2008 and to separate delivery dates into two phases: May 14, 2009 for Phase I and July 22, 2009 for Phase II. *Id.*

Likewise, on July 11, 2008, the parties entered into SLA No. 3, wherein Plaintiff again agreed that "substantial completion of Phase II is required no later than July 22, 2009." *Id.* In SLA No. 3, Plaintiff "expressly waive[d] and release[d] any and all rights, causes of action, claims or remedies it has or may have . . . under the Lease documents, in equity or at law, for any and all delays caused by the other party with respect to the performance of the Lease that have been committed or incurred prior to June 2, 2008, except as specifically excepted and reserved hereunder." *Id.* Therefore, Plaintiff's only reservations were limited to the right to certify a claim for cost escalations associated with a specific tenant improvement, the right to claims arising from any delay or cost increase attributable to specific change directives, and the right to claims based upon facts and circumstances occurring *after June 2, 2008*. *Id.* (emphasis added).

In sum, in both SLA No. 2 and SLA No. 3, Plaintiff expressly recognized the Government's right to issue a default termination, if Plaintiff failed to meet the specified Substantial Completion deadlines. Gov't Mot. at 21. Plaintiff only retained the right to assert certain specific claims after June 2, 2008. Pl. App. B-5-B-7. As a matter of law, however, those claims are insufficient to state a claim for cardinal change. *Int'l Data Prods. Corp.* v. *United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (defining "cardinal change" as a "breach that occurs when the Government effects a change in the work so drastic that it effectively requires the contractor to perform duties materially different from those in the original bargain"). Plaintiff, however, alleges a breach of and cardinal change to the Lease based upon all of the ordered tenant improvements. Gov't Mot. at 22. If the pre-June 2008 orders are excluded, however, the remaining challenged change orders are insufficient to support a claim for cardinal change. *Id.*

### b.    Plaintiff's Response.

Plaintiff responds that the May 12, 2009 Complaint states a claim upon which relief may be granted based on the additional tenant improvements unilaterally ordered by the Government for these reasons: "(1) they violate Solicitation § 1.10 because additional Tenant Improvement Allowance is not available; (2) they violate the Changes Clause; and (3) they constitute a cardinal change outside the scope of the Lease." Pl. Opp. at 28.

Solicitation § 1.09 contains no language authorizing GSA to request or order additional tenant improvements. Pl. App. A-15. Section 1.09 only discusses the manner of payment for tenant improvements in excess of the Tenant Improvement Allowance. *Id.* ("The Government agrees to pay for all Tenant Improvements in excess of the Tenant Allowance in a lump sum payment(s) (defined as a Tenant Improvement Contribution) once accepted and approved by the Contracting Officer pursuant to the Prompt Payment paragraph of GSA Form 3517X."). The text of Section 1.09 also does not provide any authority for GSA unilaterally to order unlimited additional tenant improvements, without any consideration of Plaintiff's ability to obtain additional funding. Pl. Opp. at 30.

The Government's interpretation of Section 1.09 has the "absurd result" of turning Plaintiff into an "unlimited revolving line of credit" for tenant improvements that the Government should have included in the Tenant Improvement Allowance when the Solicitation was issued. *Id.* The Solicitation contemplated a financial structure in which offerors submitted their development cost estimates and proposed construction loan with their offers. *Id.* (citing Solicitation § 1.7(D)(9) and § 3.13). GSA was aware of the terms of Plaintiff's proposed financing, but did not object or notify Plaintiff that the loan was inadequate or that it needed to be increased in anticipation of multiple unilateral change orders. Compl. ¶ 15. The Government's interpretation of Section 1.09, however, would force Plaintiff to plan for an indeterminate amount of additional financing to accommodate tenant improvements that GSA did not include in the Tenant Improvement Allowance. Pl. Opp. at 30.

Nevertheless, assuming *arguendo* that Solicitation § 1.09 authorized GSA unilaterally to order additional tenant improvements, GSA's actions still are subject to the cardinal change doctrine. *Id.* at 31. GSA unilaterally ordered $37,000,000 in additional tenant improvements beyond the original Tenant Improvement Allowance, placing an undue economic burden on Plaintiff. *Id.* This "altered the nature of [Plaintiff's] obligations under the Lease," dramatically increased the total cost of the Project, and required Plaintiff to "perform duties materially different from those originally bargained for." Compl. ¶ 62. Moreover, the Government's Motion To Dismiss does not argue that the May 12, 2009 Complaint fails to state a claim upon which relief can be granted as to a cardinal change. Pl. Opp. at 31-32.

Likewise, the Government's argument that the alleged breach of Solicitation § 1.10 must be dismissed for failure to state a claim lacks merit. *Id.* Section 1.10 limits the amount of tenant improvements that GSA may request beyond the Tenant Improvement Allowance, and is subject to the cardinal change doctrine. *Id.* The Government fails to appreciate that Solicitation § 1.09 and § 1.10 address different aspects of tenant improvements in excess of the Tenant Improvement Allowance. *Id.* at 29. Section 1.10 governs tenant improvements in addition to those contemplated by the Tenant Improvement Allowance and only states that GSA *may* "request additional Tenant Improvement Allowance with the terms to be negotiated "*if* available." Pl. App. A-16 (emphasis added). Nor does Section 1.10 include any language authorizing GSA unilaterally to order additional tenant improvements in the absence of available funding. Pl. Opp. at 29.

The Supplemental Lease Agreements do not prevent Plaintiff from requesting declaratory relief for cardinal change. *Id.* at 32. First, the Government wrongly asserts that the provision in SLA No. 2 reestablishing completion dates precludes the cardinal change claim in the May 12, 2009 Complaint. *Id.* at 33. SLA No. 2 states that GSA has the right to seek a termination or extend the Delivery Date, if Plaintiff does not reach 80% completion by the Delivery Date. Gov't Ex. A ("[I]n the event the premises will not be 80% complete by the Delivery Date . . . the Lease provides the Government right to either seek to terminate the Lease or extend the Delivery Date."). GSA, however, cannot terminate a contract for default, if the contractor is asked to perform a cardinal change. *Malone* v. *United States*, 849 F.2d 1441, 1446 (Fed. Cir. 1988) (holding that a cardinal change "provides [the contractor] with a legal right to avoid the contract, discharges [the contractor's] duty to perform, and relieves [the contractor] of the default termination and its consequences"). Therefore, SLA No. 2 simply reestablished new completion

dates and confirmed when GSA could terminate for untimely performance.  Pl. Opp. at 35.  SLA No. 2 does not authorize GSA to impose cardinal changes.  *Id.*

The Government also mischaracterizes the scope of the waiver claims in SLA No. 3. Gov't Ex. A ("This SLA #3 is limited to waiver of the Parties' rights to recover for time and costs of performance associated solely with delay.").  The May 12, 2009 Complaint does not allege a delay claim, but one for cardinal change, outside the scope of the limited waiver set forth in SLA No. 3.  Pl. Opp. at 33.

### c.        The Government's Reply.

The Government replies that Plaintiff did not dispute that: the post-June 2, 2008 change orders were insufficient to state a claim for cardinal change; or that the claims for breach and cardinal change are based on all of the ordered tenant improvements viewed in the aggregate; or that, even if the pre-June 2008 orders are removed from consideration, the remaining orders are insufficient to state a claim for cardinal change.  Gov't Reply at 14.  Therefore, the only question before the court is whether the negotiated Supplemental Lease Agreements to reset the project completion dates preclude Plaintiff from bringing a cause of action based on change orders previously issued.  *Id.* at 15.

On February 29, 2008, GSA agreed, in SLA No. 2, that it would not terminate the Lease for default, despite Plaintiff's failure to meet the Lease's initial required occupancy date, if Plaintiff agreed to deliver the Project in two phases, according to new specified project completion dates.  Gov't Ex. 1.  Accordingly, SLA No. 2 expressly recognized that the new project completion dates represented GSA's "limited forebearance of the right to terminate this Lease."  *Id.*  Likewise, SLA No. 3 reconfirmed that Plaintiff was required to deliver the Project in two phases and that GSA's right to terminate for default was limited to the new dates set forth in SLA No. 2.  *Id.*  Plaintiff also reserved the right to submit a claim for increased construction costs due to the expiration of the tenant improvement pricing prior to GSA's acceptance in April 2008, and GSA reserved the right to assert Plaintiff's delay as a defense to that claim.  *Id.* Plaintiff reserved rights "under the Lease for remedies and damages" to all claims arising out of any change orders or any other facts or circumstances occurring after June 2, 2008, and reserved the right to assert claims related to the construction costs of any change orders "as expressed in bids received prior to June 2, 2008."  *Id.*

Plaintiff incorrectly assumes that the new dates agreed to in SLA No. 2 did not impact Plaintiff's ability to claim breach for a cardinal change.  Gov't Reply at 16.  Such an interpretation would "render illusory" GSA's promise to forebear from terminating Plaintiff for default, in light of Plaintiff's promise to deliver the Project by the new dates.  *Id.*  Accordingly, Plaintiff cannot rely on a cardinal change claim to avoid compliance with the new dates bargained for in SLA No. 2, since Plaintiff released any such change claim when it agreed to deliver the vast majority of the tenant improvements, pursuant to a new schedule.  *Id.* at 17.

In addition, the Lease provides that any tenant improvement costs that exceed the Tenant Improvement Allowance will be paid by GSA according to the Tenant Improvement Contribution.  Pl. App. A-15.  The Lease also provides that no base building construction costs

may be paid either from the Tenant Improvement Allowance or the Tenant Improvement Contribution. *Id.* Therefore, Solicitation § 1.10 only addresses the circumstances under which the rent can be adjusted if GSA does not use all of the Tenant Improvement Allowance, decides to "buy down" the Tenant Improvement Allowance, or requests that additional Tenant Improvement Allowance be amortized into the rent. As such, Solicitation § 1.10 has no application in this case, because GSA never requested any adjustment to the rental rate. Gov't Reply at 18.

Plaintiff's interpretation is further flawed, because it depends upon reading Solicitation §§ 1.9-1.10, out of order, and completely ignoring Solicitation § 1.9, *i.e.*, Plaintiff's interpretation "destroys the distinction between [Tenant Improvement Allowance] and Tenant Improvement Contribution." Gov't Mot. at 19. In fact, Plaintiff fails to address the meaning of "Tenant Improvement Contribution," a term not included in Solicitation § 1.10. Gov't Reply at 18. Instead, Plaintiff asserts that Solicitation § 1.9 only relates to the manner of payment, but does not explain what that means. Pl. Opp. at 29. Solicitation § 1.9, however, governs the timing of payments for tenant improvements in excess of the tenant allowance and accounts for the term "Tenant Improvement Contribution." *Id.* Therefore, the authority to require the construction of tenant improvements in excess of the Tenant Improvement Allowance is implicit in Solicitation § 1.9's explanation of the payments of the Tenant Improvement Contribution. *Id.*

### 2.    The Court's Resolution.

To survive a motion to dismiss for failure to state a claim upon which relief may be granted, a complaint must "state a claim to relief that is plausible on its face," *i.e.*, sufficient factual content must be pled on which a court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007)). The plausibility standard "asks for more than a sheer possibility that the defendant acted unlawfully." *Id.* "Plausibility of 'entitlement to relief'" requires more than pleading facts that are "merely consistent with" a defendant's liability. *Id.* (quoting *Twombly*, 550 U.S. at 557).

In *Iqbal*, the United States Supreme Court discussed the "two working principles" of *Twombly's* heightened pleading requirements. *Id.* First, although factual allegations alleged must be accepted as true, the trial court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citing *Twombly*, 550 U.S. at 555). Accordingly, the Court advised trial courts to begin their analysis "by identifying allegations [of law] in the complaint that are not entitled to the assumption of truth." *Id.* at 1949-50. If the legal allegations are "conclusory in nature," they are not entitled to the presumption of truth. *Id.* at 1950. Second, to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint must state a "plausible claim for relief." *Id.* at 1950 (citing *Twombly*, 550 U.S. at 556). Here, factual allegations are examined to determine "if they plausibly suggest an entitlement to relief." *Id.* at 1951. These two analytical steps together determine whether a complaint should be dismissed, pursuant to RCFC 12(b)(6). *Kenney Orthopedic, LLC* v. *United States*, 88 Fed. Cl. 688, 697 (2009).

The May 12, 2009 Complaint seeks a declaratory judgment that GSA's additional tenant improvements in excess of the Tenant Improvement Allowance of $10,820,800: (1) was a breach

of the September 2, 2005 Lease generally; and (2) constituted a cardinal change of the September 2, 2005 Lease that Plaintiff is not obligated to perform. Compl. ¶¶ 55-62. In 1992, the Tucker Act was amended to clarify that the United States Court of Federal Claims' jurisdiction extended to "judgment upon any claim by or against . . . a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including . . . other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of [the CDA]." 28 U.S.C. § 1491(a)(2); *see also Garrett* v. *General Elec. Co.*, 987 F.2d 747, 750-51 (Fed. Cir. 1993) (recognizing that this amendment provided the United States Court of Federal Claims with jurisdiction over a "nonmonetary substitute for monetary relief[.]"). Therefore, although the court has jurisdiction to grant Plaintiff's claim for a declaratory judgment, in this case, the court declines to exercise that jurisdiction for two reasons.

First, claims for a breach of contract and cardinal change entail questions of fact. *Rumsfeld* v. *Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) ("The finding of a cardinal change is principally a question of fact.") (quotations and citations omitted). Although a declaratory judgment is not precluded if it involves disputed questions of fact, a declaratory judgment cannot be issued to resolve a disputed question of fact that is a *determinative issue*. *Gilbert* v. *Department of Justice*, 334 F.3d 1065, 1072 (Fed. Cir. 2003) ("[T]he conduct of the allegedly breaching party – in other words, what the party did or did not do – is an issue of fact. [Only where] the facts are undisputed, the determination of whether there has been material non-compliance with the terms of a contract, and hence breach, necessarily reduces to a question of law."). As is evident from the parties' arguments and the May 12, 2009 Complaint, determinative issues are in dispute.

Second, the United States Supreme Court has emphasized that the trial court has "unique and substantial" discretion in determining whether the issuance of declaratory relief in a particular matter is appropriate. *Wilton* v. *Seven Falls Co.*, 515 U.S. 277, 287 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."). In *Wilton*, the Court held that, "[c]onsistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close." *Id.* at 288. In addition, our appellate court has cautioned that declaratory relief is not appropriate in all instances:

> This is not to say that the Court of Federal Claims (or an agency board of contract appeals) is required to issue a declaration of rights whenever a contractor raises a question of contract interpretation during the course of contract performance. In responding to such a request, the court or board is free to consider the appropriateness of declaratory relief, including whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests . . . [t]he discretion to grant declaratory relief only in limited circumstances allows the court or board to restrict the occasions for intervention during contract performance to those involving a fundamental question of contract interpretation or a *special need for early resolution of a legal issue*.

*Alliant Techsystems*, 178 F.3d at 1271 (emphasis added).

In this case, the May 12, 2009 Complaint's prayer for a declaratory judgment does not invoke "a special need for early resolution of a legal issue." *Id.* At present, the Project is not complete, because of the need to work out a schedule and secure additional financing. TR at 62-63 (GOVERNMENT COUNSEL: "There needs to be a new schedule negotiated at this point. We have to negotiate a new schedule. We have to iron out exactly what it is that needs to be done, what the schedule is going to be."); *see also* TR at 46 (PLAINTIFF'S COUNSEL: "[Bank of America] didn't want to finance the additional tenant improvements. We went to them. Hey, the government is making us do this; we don't think we have to do it, but can you finance it. They declined that opportunity."). It appears to the court that securing financing may be facilitated by the resolution of this suit on the merits, since the Receivership Order requires any potential damages awarded to be paid to Bank of America. Gov't Ex. 5 at ¶ 7(i) ("If [Plaintiff] recovers damages in the [United States Court of Federal Claims] litigation, it shall pay the proceeds to Bank of America to the extent of any deficiency on the loan.").

Accordingly, the court has declined to exercise its discretion to grant declaratory relief. As such, the Government's motion to dismiss for failure to state a claim, pursuant to RCFC 12(b)(6), is denied as moot.

## IV.    CONCLUSION.

For these reasons, the Government's September 11, 2009 Motion To Dismiss, pursuant to RCFC 12(b)(1), is denied. The Government's September 11, 2009 Motion To Dismiss, pursuant to RCFC 12(b)(6), is denied as moot.

In addition, the court will stay these proceedings for 90 days to allow Plaintiff to request a Final Decision of the Contracting Officer for a sum certain alleged to be due as a result of the alleged breach of contract or alleged cardinal change claims. If Plaintiff elects not to seek a Final Decision, the court will dismiss the May 12, 2009 Complaint for failure to prosecute, pursuant to RCFC 41(b).

If Plaintiff satisfies the jurisdictional requirements for a CDA claim for money damages, the court will afford Plaintiff an opportunity to amend the May 12, 2009 Complaint. At that time, the Government may refile a Motion to Dismiss under RCFC 12(b)(6) or otherwise proceed toward trial.

The court will convene a telephone status conference on May 21, 2010 to ascertain how Plaintiff elects to proceed.

**IT IS SO ORDERED**.

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**